GAY STUDENTS ORGANIZATION OF
the UNIVERSITY OF NEW HAMP-
SHIRE et al., Plaintiffs-Appellees,

v.

Thomas N. BONNER, Individually and
as President of the University of New
Hampshire, et al., Defendants-Appel-
lants.

GAY STUDENTS ORGANIZATION OF
the UNIVERSITY OF NEW HAMP-
SHIRE et al., Plaintiffs-Appellees,

v.

Meldrim THOMSON, Jr.,
Defendant-Appellant.

Nos. 74–1075, 74–1076.

United States Court of Appeals,
First Circuit.

Dec. 30, 1974.

Charles G. Douglas, III, Concord, N. H., with whom Michael M. Black, Concord, N. H., was on brief, for Meldrim Thomson, Jr., appellant.

Joseph A. Millimet, Manchester, N. H., with whom Silas Little, III and Devine, Millimet, Stahl & Branch, Manchester, N. H., were on brief, for Thomas Bonner and others, appellants.

Richard S. Kohn, N.H.Civ.Lib.Union, Concord, N. H., for appellees.

E. Carrington Boggan, New York City, on brief, for Lambda Legal Defense and Education Fund, Inc., amicus curiae.

Before COFFIN, Chief Judge, McEN-
TEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

The Gay Students Organization (GSO) was officially recognized as a student organization at the University of New Hampshire in May, 1973,[1] and on November 9, 1973 the group sponsored a dance on campus. The dance itself was held without incident, but media coverage of the event and criticism by Governor Meldrim Thomson, Jr., led the University's Board of Trustees to reconsider its treatment of the organization. The next day, November 10, 1973, the Board issued a "Position Statement" which indicated that the University would attempt to have determined the "legality and appropriateness of scheduling social functions by the Gay Students Organization" and which "directed that in the interim the University administration would schedule no further social functions by the Gay Students Organization until the matter is legally resolved." The University subsequently filed a declaratory judgment action in Strafford County Superior Court on November 21, 1973.

When the GSO requested permission to sponsor a play on December 7 and have a social function afterward, the University permitted the play but denied permission for the social function. The play was given as scheduled, and the GSO held a meeting following it. Sometime during the evening copies of two "extremist" homosexual publications were distributed by individuals over whom the GSO claims it had no control.

Governor Thomson wrote an open letter to the trustees after the play, warning that if they did not "take firm, fair and positive action to rid your campuses of socially abhorrent activities" he would "stand solidly against the expenditure of one more cent of taxpayers' money for your institutions." Dr. Thomas N. Bonner, President of the University, then issued a public statement condemning the distribution of the homosexual literature and announcing that a repetition of the behavior would cause him to seek suspension of the GSO as a student organization. Bonner also revealed that he had "ordered that the current Trustee ban on GSO social functions be interpreted more strictly by administrative authorities than had been the case before December 7, 1973."

The lawsuit which is the subject of this appeal was filed in federal district court by the GSO on November 29, 1973. The complaint alleged First and Fourteenth Amendment violations giving rise to a cause of action under 42 U.S.C. § 1983, and sought injunctive and declaratory relief. A hearing was held on December 10 on the GSO's request for a preliminary injunction, and the parties agreed that the hearing would serve as a final hearing on the merits. Defendants, hereinafter "appellants", requested that the proceeding be reopened for the submission of additional evidence, and a second hearing was held on December 28. On January 16, 1974, the district court held for the GSO (sometimes hereinafter referred to as "appellees") on the ground that its members had been denied their First Amendment right of

---

1. The organization filed the following Statement of Purpose:

   "1) The primary purpose of the UNH Gay Students Organization is to promote the recognition of gay people on campus and to form a viable organization through which bisexual and homosexual people may express themselves.

   "2) Through this organization social functions will be organized in which both gay and straight people can learn about the others' thoughts and feelings concerning sexuality and sexual roles.

   "3) In an effort to educate the public about bisexuality and homosexuality, this organization will attempt to affect social changes through public relation measures such as guest lecturers, free literature, films, newspaper articles and radio programs.

   "4) Not the least important reason for establishing a gay organization is to give bisexual and homosexual members of the college community a place to communicate with each other and form discussion groups so that a healthy gay consciousness can evolve among students."

association. 367 F.Supp. 1088, 1095 (D.N.H.1974). The court found no direct impairment of the GSO's "more traditional First Amendment rights", presumably the freedoms of speech, assembly and petition from which the right of association is derived. *See* Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). The court also indicated that in its view substantial equal protection questions were raised by defendants' policy, and that, First Amendment considerations aside, the state could not demonstrate that the classification rationally furthered a legitimate state interest. 367 F.Supp. at 1098. The court enjoined appellants "from prohibiting or restricting the sponsorship of social functions or use of University facilities for such functions by the Gay Students Organization" and "from treating the Gay Students Organization differently than other University student organizations."

◼ Before considering the merits of the appeal, we must deal with several procedural issues raised by appellants. Governor Thomson claims, first of all, that the district court was without jurisdiction to hear the case under 42 U.S.C. § 1983 and 28 U.S.C. § 1343 because appellants are not "persons" within the ambit of § 1983. In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court held in an action for damages that a municipal corporation is not a "person" within the meaning of the statute, and City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), authoritatively rejected the argument that a different result is called for in cases involving requests for injunctive relief. In light of these cases, we would be inclined to hold, were the question before us, that the University of New Hampshire, "a body politic and corporate" established by state statute and supported by state funds, is not subject to suit under § 1983. *See, e. g.,* Blanton v. State University of New York, 489 F.2d 377, 382 (2d Cir. 1973); Adamian v. University of Nevada, 359 F.Supp. 825 (D.Nev.1973); Note, the Supreme Court, 1972 Term, 87 Harv.L.Rev. 1, 258 (1973). But here the action was brought, not against the University or its Board of Trustees as a body, but against a number of the University's officials. The defendants are Bonner, President and an *ex officio* member of the Board of Trustees; Stevens, Vice Provost for Student Affairs; O'Neil, Director, Recreation and Student Activities; Governor Thomson, an *ex officio* member of the Board; and the other members of the Board, including Dunlap, the Chairman. These persons were originally sued both individually and in their official capacities, but the action against them as individuals was later dismissed, with the approval of the GSO. They remain defendants only as officials of the University, but we do not read *Bruno* to hold that officials, as opposed to state instrumentalities, are not § 1983 "persons", at least so far as injunctive or declaratory relief is concerned. Ybarra v. City of Town of Los Altos Hills, 503 F.2d 250 (9th Cir. 1974); Rochester v. White, 503 F.2d 263 (3d Cir. 1974), rev'g, Rochester v. Baganz, 365 F.Supp. 179 (D.Del.1973); The Supreme Court, 1972 Term, *supra,* at 258–60. We cannot accept the conclusion that § 1983, directed specifically and exclusively at misconduct carried out under the color of state law, is not available to challenge the actions of persons who are acting in their capacities as state officials.[2]

2. We have examined the authorities to the contrary cited by the governor, and find them unpersuasive. *Rochester v. Baganz is* the only case cited which stands squarely for the proposition asserted and, as indicated in the text, that holding was reversed on appeal. Veres v. County of Monroe, 364 F.Supp. 1327 (E.D.Mich.1973), and Frye v. Lukehard, 364 F.Supp. 1379 (W.D.Va.1973), both involved claims for payments which, if upheld, would have been satisfied from a public treasury, and thus raised different issues than those presented here. Harkless v. Sweeny Ind. School Dist., 300 F.Supp. 794, 807 (S.D.Texas 1969), is another cited case in which the court of appeals reversed and held against, not in favor of, the position taken by the governor. "We find no prohibition in Monroe v. Pape against the exercise of federal judicial power through § 1983 to redress constitution-

The other preliminary issues which must be dealt with arise out of appellees' failure to timely serve several appellants. Bonner, Stevens and O'Neil were properly served, and attorney Joseph Millimet was authorized to and did accept service on behalf of Dunlap, Chairman of the Board of Trustees. The other members of the Board, however, were not served in advance of the hearings before the district court. Some were served on January 15, 1974, others on January 19, and Trustee Spanos was not served at all. The trustees who were not served before the hearings (hereinafter referred to as "the trustees") contend that the district court's opinion, filed on January 16, is not binding on them. The district court held a hearing on this matter on January 29, and on January 31 filed a Memorandum Opinion on Motions to Dismiss. The court, with the agreement of the GSO, dismissed the action as to the trustees in their individual capacities, but denied the motions to dismiss as they related to the trustees in their official capacities.

Deferring for the moment the status of Governor Thomson, we note first that there is no challenge to the district court's finding that the trustees had actual knowledge of the pendency of the lawsuit. See Adams v. School Board, 53 F.R.D. 267 (M.D.Pa.1971). Indeed, they also knew that the court contemplated a speedy decision. As to the court's finding of waiver of defects in service, the sequence of relevant events is as follows. The Board, through its Executive Committee, had earlier authorized the bringing of the state court proceeding against the GSO in order to obtain a resolution of what was seen as a troublesome legal issue. On December 17, a motion to reopen the proceedings in this case to take further evidence was filed on behalf of "the University of New Hampshire [sic] and the other defendants"; the motion also demanded from appellees a copy of the literature distributed at the December 7 performance of the play and the

appearance of GSO's president at the hearing. This was granted on December 20, and the reopened hearing was held on December 28, in which three University officials and a GSO member testified. Among those testifying was Allen Bridle, one of the trustees now challenging service and apparently the only trustee with personal knowledge relevant to the subject matter of the hearing.

At the January 29 hearing in the district court, Millimet stated that in the state court action he was representing the University and "the trustees in so far as they are the University". And it was Millimet's own understanding, which he admitted he "probably" communicated to counsel for appellees, that he was authorized to act for the trustees in the federal court action raising many of the same issues pending before the state court. See Bethlehem Steel Corp. v. Devers, 389 F.2d 44 (4th Cir. 1968). No objection to the court's jurisdiction over the trustees was made until after the decision on the merits was rendered, and Millimet's account of the January 19 trustees' meeting shows a clear relationship between the unfavorable decision of January 16 and the decision to make a last minute issue of failure of timely service: "I think if I can recite my understanding of what occurred at the meeting of January 19th was that certain individual members of the Board of Trustees, who disagreed with the decision of the Court, felt that they did not want to be treated individually as defendants in this matter, and, therefore, asked that I press the present motion."

In short, the critical facts bearing on jurisdiction over the defendants other than the governor are these: timely service was made on some, not all; all, however, had authorized their common attorney to prosecute concurrent litigation on the same matter in the state court and had knowledge of the suit being brought against them; acting on a motion brought on behalf of all, the

al wrongs through requiring appropriate official acts by officials sued in their representative capacities." 427 F.2d 319, 323 (5th Cir.

1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971).

court reopened the case and received testimony proffered in their name; only when an adverse decision had been rendered did defendants protest, their concern being expressed over the prospect of individual liability; upon being apprised of this concern the court relieved defendants in this regard by dismissing the action against them in their individual capacities. Had this action not been taken, we might well look upon the absence of timely service on some defendants as fatal. The prospect of individual liability would have been a factor militating against a finding of waiver based on what could only be viewed as a group position. But the entire sequence reveals a group involved in both pursuing affirmatively and aggressively defending an institutional position, entrusting action in both areas to their institutional attorney. With liability confined to declaratory and injunctive relief, operative only on defendants in their official capacities, and on their successors, the district court having supportably found no possibility of prejudice, we see no basis to overrule the finding of waiver of defect of service.

The basic fact which accounts for much of the confusion is that, whatever the technical legal doctrines relating to § 1983 may be, the trustees, insofar as their official roles were concerned, regarded themselves as indistinguishable from the University and its Board of Trustees. To the extent that they were acting for the University, they were content to have Millimet represent them and to have the federal district court decide the legal controversy between the University and the GSO. The trustees, as trustees, must be considered to have waived, by this course of conduct, whatever right they had to personal service. *See* Alger v. Hayes, 452 F.2d 841 (8th Cir. 1972); United States v. Gajewski, 419 F.2d 1088 (8th Cir. 1969). They were aware of the litigation and saw no need to present to the court legal theories or evidence beyond those offered by Millimet, and they must be held to that decision despite the outcome adverse to their interests. To hold otherwise would be to reward Monday morning gamesmanship where there has been no encroachment on the rights of parties.

We find that Governor Thomson's position is somewhat different. Millimet, in conferring with counsel for the GSO on the question of whether he would accept service for the trustees, said that he could not accept service on behalf of the individuals other than Dunlap, "and particularly in behalf of the governor, who I knew had some different views about the matter and who, so far as I knew, had not participated in the meeting where the Executive Committee voted to proceed with the petition in the State Court." The governor's undenied role in precipitating the confrontation between the GSO and the University supports the suggestion that he would have expressed views and made arguments different from those of the administrators and the other trustees had he appeared. Separate counsel appeared for the governor at the January 29 hearing, and the governor filed an answer to the complaint within the prescribed period once he was served. The injunction issued by the district court must be modified to exclude the governor from its reach. He remains bound, of course, to the extent that he is "in active concert or participation" with the other defendants with regard to matters covered by the injunction. Fed.R.Civ.P. 65(d). The other defendants—the three University administrators and all the other members of the Board of Trustees—do remain before the court, so there can be no substantial argument that the court is without the power to award effective relief.

Coming to the merits, we are conscious of the tension between deeply felt, conflicting values or moral judgments, and the traditional legal method of extracting and applying principles from decided cases. First, this case deals with a university attempting to regulate student activity—in the *in loco parentis* tradition which most judges, being over thirty, acknowledged without much question during their years of matriculation.

Second, the campus group sought to be regulated stands for sexual values in direct conflict with the deeply imbued moral standards of much of the community whose taxes support the university.

The underlying question, usually not articulated, is whether, whatever may be Supreme Court precedent in the First Amendment area, group activity promoting values so far beyond the pale of the wider community's values is also beyond the boundaries of the First Amendment, at least to the extent that university facilities may not be used by the group to flaunt its credo. If visceral reactions suggest an affirmative answer, the next task for judges is to devise a standard which, while damping down the First Amendment on a university campus, is generally applicable and free from the dangers of arbitrariness. At this point troubles arise. How are the deeply felt values of the community to be identified? On an issue such as permissive abortion, the wider community may well be divided among those believing in "the right to life", those believing in "the right to control over one's body", and those who do not feel deeply either way. Assuming that "community-wide values" could be confidently identified, and that a university could limit the associational activity of groups challenging those values, such an approach would apply also to socialists, conscientious objectors, vivisectionists, those favoring more oil refineries. As to each group, there are sectors of the community to whom its values are anathema. Or, if values be limited to morals, the barrier would reach those attracted to pre-marital sex, atheism, the consumption of alcoholic beverages, esoteric heterosexual activity, violence on television, or dirty books. This is not to suggest that a university is powerless to proscribe either harmful activity or incitement of illegal activity, but it is to say that we are unable to devise a tolerable standard exempting this case at the threshold from general First Amendment precedents.

■ We address first one of the questions we have alluded to: is there something different about a university that makes it an enclave sheltered from the full play of the First Amendment? The Supreme Court's recent decisions in Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), and Papish v. Board of Curators, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973), indicate in no uncertain terms that the First Amendment applies with full vigor on the campuses of state universities. In *Healy* the Court rejected the notion that First Amendment protections apply with less force on campus than in the community at large, 408 U.S. at 180, 92 S.Ct. 2338, and the *Papish* Court made it clear that there is no "dual standard" to be applied in scrutinizing restrictions upon speech. 410 U.S. at 671, 93 S.Ct. 1197. *See also* Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Thonen v. Jenkins, 491 F.2d 722 (4th Cir. 1973); C. A. Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027 (1969). Indeed, the Court has recognized that the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, *supra*, 364 U.S. at 487, 81 S.Ct. at 251. Thus we proceed as if the state itself, or one of its instrumentalities other than a university, had promulgated the regulation at issue.

Given this standard by which a university regulation should be judged, we now must ask whether, even though GSO was recognized as a campus organization, its members' right of association was abridged. Here again, Healy v. James is controlling. It is true that there the university had refused to recognize the campus organization altogether rather than denying it the use of campus facilities for certain activities. But the Court's analysis in *Healy* focused not on the technical point of recognition or nonrecognition, but on the practicalities of human interaction. While the Court concluded that the SDS members' right to further their personal beliefs had been impermissibly burdened by nonrecognition, this conclusion stemmed from a

finding that the "primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes." The ultimate issue at which inquiry must be directed is the effect which a regulation has on organizational and associational activity, not the isolated and for the most part irrelevant issue of recognition *per se.*

Despite the language of *Healy* cited above, appellants argue that "social events"[3] are not among the class of protected associational activities. One aspect of this argument is the suggestion that the ban on social events is permissible because other GSO activities such as discussions are allowed. A very similar contention was rejected in *Healy.* The university had pointed out that nonrecognition affected only on-campus activities, and that therefore the individuals wishing to form an SDS group could meet and distribute literature off campus, and even meet on campus if they did so informally. The Court was thus invited to find that the individuals were free to associate even though their on-campus activities were restricted. It held, however, that the other associational opportunities available to the individuals did not ameliorate significantly the disabilities imposed by the university. Once again, its standard was expressed in the clearest of terms—"[T]he Constitution's protection is not limited to direct interference with fundamental rights." Healy v. James, 408 U.S. at 183, 92 S.Ct. at 2347; Williams v. Rhodes, 393 U.S. 23, 41, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (Harlan, J., concurring in the result); United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); Bates v. City of Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 461, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Although the Supreme Court refused in *Healy* to characterize as insubstantial the impediments to association resulting from denial of access to campus bulletin boards and the school newspaper, 408 U.S. at 181–182, 92 S.Ct. 2338, that case could conceivably be read to shelter only those group efforts at self-promotion which utilize such conventional approaches.

■ There are, however, many other ways in which an organization might wish to go about attracting members and promoting its point of view. *Healy* has been interpreted to extend to the use of campus facilities for social events in the one case of which we are aware which has considered the issue. Wood v. Davison, 351 F.Supp. 543 (N.D.Ga.1972). *See also* New Left Educ. Project v. Board of Regents, 326 F.Supp. 158 (W.D. Tex.1970), vacated on other grounds, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972) (solicitation by campus political group). We are also led to this conclusion by the realization that efforts by a state to restrict groups other than the GSO to gatherings that were in no sense "social events" would be rejected out of hand. Even a lecture or discussion, which appear to be the only types of meetings which the appellants would allow the GSO to hold, becomes a social event if beer is served beforehand or coffee afterward. Teas, coffees and dinners form the backbone of many a political candidate's campaign, and yet these activities would seemingly be subject to prohibition. While a university may have some latitude in regulating organizations such as fraternities or sororities which can be purely social, its efforts to restrict the activities of a cause-oriented group like the GSO stand on a different footing. *See* Note, Freedom of Political Association on the Campus: The Right to Official Recognition, 46 N.Y.U.L.Rev. 1149, 1158–61 (1971). Considering the important role that social events can play in individuals' efforts to associate to further their common beliefs, the prohibition of all social events must be taken

---

**3.** We are content to proceed, as did the district court, on the assumption that the policy announced by appellants reaches only purely social events, such as dances and parties, and not events such as plays. *See* 367 F.Supp. at 1095–1096.

to be a substantial abridgment of associational rights, even if assumed to be an indirect one.

■ What we have been considering is appellants' contention that, so long as an association is allowed to meet, restrictions on some of its activities are permissible—i. e., that it is enough that the glass is half full. We now address appellants' contention that when we examine the other half of the glass, the activities barred by the campus regulation, we must conclude that the First Amendment offers no protection because the activities barred are not speech related. Putting aside for a moment the question of whether GSO social events constitute "speech" in their own right, we note the district court's conclusion, not disputed by appellants, that the GSO is a political action organization, 367 F.Supp. at 1094 n. 7. See Acanfora v. Board of Educ., 359 F.Supp. 843, 856 (D.Md.1973), aff'd, 491 F.2d 498, 500–501 (4th Cir.), cert. denied, —— U.S. ——, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974); n. 1, *supra* (GSO Statement of Purpose). The GSO's efforts to organize the homosexual minority, "educate" the public as to its plight, and obtain for it better treatment from individuals and from the government thus represent but another example of the associational activity unequivocally singled out for protection in the very "core" of association cases decided by the Supreme Court. NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); DeJonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937).[4] Moreover, the activity engaged in by the GSO would be protected even if it were not so intimately bound up

with the political process, for "it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters." NAACP v. Alabama ex rel. Patterson, 357 U.S. at 460, 78 S.Ct. at 1171; see United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 223, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964).

■ While we accept the district court's conclusion that the associational rights of GSO members· have been impermissibly regulated, we cannot agree that their "more traditional First Amendment rights", 367 F.Supp. at 1095, have not been abridged as well. *See* Wood v. Davison, 351 F.Supp. 543 (N.D. Ga.1972). Certainly GSO social functions do not constitute "pure speech", but conduct may have a communicative content sufficient to bring it within the ambit of the First Amendment. Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Communicative conduct is subject to regulation as to "time, place and manner" in the furtherance of a substantial governmental interest, so long as the restrictions imposed are only so broad as required in order to further the interest and are unrelated to the content and subject matter of the message communicated. Police Dept. v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); United States v. O'Brien, 391 U.S. at 376–377, 88 S.Ct. 1673.

There can be no doubt that expression, assembly and petition constitute significant aspects of the GSO's conduct in

---

4. As we have indicated at the outset, we see no sanction in reason or law for saying that, absent a direct threat to safety or the enforcement of law, certain groups lack a right of association. Many of the groups whose associational rights have been recognized by the Supreme Court have stood for propositions which must have seemed as outrageous as the GSO's positions today must seem to many. *See, e. g.,* Healy v. James, 408 U.S. at 187, 92 S.Ct. 2338; United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); DeJonge v. Oregon, 299 U.S. at 353, 57 S.Ct. 255.

holding social events.[5] The GSO was created, as its Statement of Purpose attests, to promote the free exchange of ideas among homosexuals and between homosexuals and heterosexuals, and to educate the public about bisexuality and homosexuality. GSO claims that social events in which discussion and exchange of ideas can take place in an informal atmosphere can play an important part in this communication. It would seem that these communicative opportunities are even more important for it than political teas, coffees, and dinners are for political candidates and parties, who have much wider access to the media, being more highly organized and socially accepted. And beyond the specific communications at such events is the basic "message" GSO seeks to convey—that homosexuals exist, that they feel repressed by existing laws and attitudes, that they wish to emerge from their isolation, and that public understanding of their attitudes and problems is desirable for society.

Perhaps these claims, being self serving, fall short of establishing the speech-relatedness of GSO social events. But they receive the strongest corroboration from the interpretation placed on these events by the outside community, as related by appellants. Appellants have relied heavily on their obligation and right to prevent activities which the people of New Hampshire find shocking and offensive. In the brief for President Bonner and the University administrators we are told that the "activity of the GSO was variously labelled a spectacle, an abomination and similar terms of disapprobation" after the GSO dance on November 8, 1973; that the University has an obligation to prevent activity which affronts the citizens of the University and the town and which violates breach of the peace statutes; that the GSO dance constituted "grandstanding";

that recognition of the GSO inflamed a large segment of the people of the state; that the organization cannot be permitted to use its unpopularity without restriction to undermine the University within the state; and that "the ban on social functions reflects the distaste with which homosexual organizations are regarded in the State".

We do not see how these statements can be interpreted to avoid the conclusion that the regulation imposed was based in large measure, if not exclusively, on the content of the GSO's expression. It is well established that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dept. v. Mosley, 408 U.S. at 95, 92 S.Ct. at 2290. Not only do appellants' statements indicate that the prohibition reflects a distaste both for the ideas held and communicated by GSO members and for the larger message conveyed by the very holding of such public events, but the fact that the GSO alone was made subject to the regulation indicates that the ban is content-related. *See* Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1, 29–30. Nor do the events of November 8 leave room for the conclusion that the disapproval of the GSO event was due to the occurrence of violently disruptive or otherwise illegal activities. The adverse reaction must be viewed as precipitated by the GSO's program and the fact that the organization was aggressively presenting it to the public.

With the expressive quality of the GSO activities established, the appellants' policy regulating the activities must be measured against the detailed standard articulated in United States v. O'Brien. The Supreme Court there upheld a conviction based upon the burning

---

**5.** Indeed, there is some support for the proposition that dancing, the activity which the appellants are most confident in asserting their right to regulate, is itself a form of expression protected by the First Amendment.

*See* Salem Inn, Inc. v. Frank, 501 F.2d 18, 20 (2d Cir. 1974); *cf.* California v. LaRue, 409 U.S. 109, 118, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972).

of a draft card by one who claimed to be demonstrating against the war and against the draft. The Court recognized that such conduct could be regulated despite its "speech" element because (1) the regulation was within the constitutional power of the government; (2) it furthered an important or substantial governmental interest; (3) the governmental interest was unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms was no greater than essential to the furtherance of that interest. 391 U.S. at 377, 88 S.Ct. 1673.

As is apparent from our discussion above of the extent to which appellants' policy toward the GSO is content-related, the curtailing of expression which they find abhorrent or offensive cannot provide the important governmental interest upon which impairment of First Amendment freedoms must be predicated. Papish v. Board of Curators, 410 U.S. 667, 670, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973); Healy v. James, 408 U.S. at 187–188, 92 S.Ct. 2338. *See also* Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); Cline v. Rockingham County Superior Court, 502 F.2d 789 (1st Cir. 1974). "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." Police Dept. v. Mosley, 408 U.S. at 96, 92 S.Ct. at 2290; Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951); Bonner-Lyons v. School Comm., 480 F.2d 442 (1st Cir. 1973); Joyner v. Whiting, 477 F.2d 456 (4th Cir. 1973); Wright, The Constitution on the Campus, at 1050.[6]

Another interest asserted by appellants is that in preventing illegal activity, which may include "deviate" sex acts, "lascivious carriage", and breach of the peace. But there has been no allegation that any such illegal acts took place at the GSO social events held on November 8 and December 7, 1973. Indeed, we emphasize the finding of the district court that "There were no official complaints about the dance, and no evidence was adduced to show that improper or illegal activities had taken place" at the dance. 367 F.Supp. at 1091. The only activity of even questionable legality discussed in the record involved the distribution of printed materials alleged to be obscene, and the district court found that no University of New Hampshire students were responsible for the distribution. Mere "undifferentiated fear or apprehension" of illegal conduct, Tinker v. Des Moines Indep. Community School Dist., 393 U.S. at 508, 89 S.Ct. 733, is not enough to overcome First Amendment rights, and speculation that individuals might at some time engage in illegal activity is insufficient to justify regulation by the state.

The University is by no means bereft of power to regulate conduct on campus. Not only may it act to prevent criminal conduct by policies focused on real and established dangers, but it can proscribe advocacy of illegal activities falling short of conduct, or conduct in itself noncriminal, if such advocacy or conduct is directed at producing or is likely to incite imminent lawless action. Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *see* Communist Party of Indiana v. Whitcomb, 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974).

Finally there is a residual power going beyond the prevention of criminal

---

**6.** Since we find the First Amendment issues presented here to be dispositive, it is not necessary to consider fully the equal protection questions with which they are intertwined. The equal protection challenge to the university policy strikes us as substantial in its own right, however, and our First Amendment analysis draws heavily upon the conclusions which must be drawn from the fact that only the GSO among campus groups has been forbidden to hold social events.

conduct and the kind of advocacy of such conduct we have described. In Healy v. James, 408 U.S. 169, 189, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1971), the Supreme Court said that in a school environment, the power to prohibit lawless action is not limited to acts of a criminal nature: "Also prohibitable are actions which 'materially and substantially disrupt the work and the discipline of the school'." *Id.* at 189, 92 S.Ct. at 2350, *quoting Tinker,* 393 U.S. at 513, 89 S.Ct. 733. We would assume that a university, so minded, would not be powerless to regulate public petting (heterosexual or otherwise), drinking in university buildings, or many other noncriminal activities which those responsible for running the institution rightly or wrongly think necessary "to assure that the traditional academic atmosphere is safeguarded." 408 U.S. at 194 n. 24, 92 S.Ct. at 2352. Thus, if a university chose to do so, it might well be able to regulate overt sexual behavior, short of criminal activity, which may offend the community's sense of propriety, so long as it acts in a fair and equitable manner. The point in this case is that the district court has found no improper conduct, and it does not appear that the university ever concerned itself with defining or regulating such behavior. Defendants sought to cut back GSO's social activities simply because sponsored by that group. The ban was not justified by any evidence of misconduct attributable to GSO, and it was altogether too sweeping.

One final issue must be addressed. Appellees have requested that we enjoin appellants from proceeding with the action they instituted in state court. It is suggested that in this way the federal court judgment disposing of this controversy may be protected or effectuated. 28 U.S.C. § 2283. We do not find such action to be necessary.

The judgment of the District Court is affirmed, except as modified with regard to Governor Thomson.

