Aaron **FRICKE**

v.

**Richard B. LYNCH, in his official capacity as Principal of Cumberland High School.**

**Civ. A. No. 80–214.**

United States District Court, D. Rhode Island.

May 28, 1980.

Lynette Labinger, Providence, R. I., John P. Ward, Boston, Mass., for plaintiff.

V. James Santaniello, Providence, R. I., for defendant.

## OPINION

PETTINE, Chief Judge.

Most of the time, a young man's choice of a date for the senior prom is of no great interest to anyone other than the student, his companion, and, perhaps, a few of their classmates. But in Aaron Fricke's case, the school authorities actively disapprove of his choice, the other students are upset, the community is abuzz, and out-of-state newspapers consider the matter newsworthy.[1] All this fuss arises because Aaron Fricke's intended escort is another young man. Claiming that the school's refusal to allow him to bring a male escort violates his first and fourteenth amendment rights, Fricke seeks a preliminary injunction ordering the school officials to allow him to attend with a male escort.

Two days of testimony have revealed the following facts. The senior reception at Cumberland High School is a formal dinner-

---

1. See the New York Times of Wednesday, May 21, and the Boston Globe of Tuesday, May 20 and Wednesday, May 21.

dance sponsored and run by the senior class. It is held shortly before graduation but is not a part of the graduation ceremonies. This year the students have decided to hold the dance at the Pleasant Valley Country Club in Sutton, Massachusetts on Friday, May 30. All seniors except those on suspension are eligible to attend the dance; no one is required to go. All students who attend must bring an escort, although their dates need not· be seniors or even Cumberland High School students. Each student is asked the name of his date at the time he buys the tickets.

The principal testified that school dances are chaperoned by him, two assistant principals, and one or two class advisers. They are sometimes joined by other teachers who volunteer to help chaperone; such teachers are not paid. Often these teachers will drop in for part of the dance. Additionally, police officers are on duty at the dance. Usually two officers attend; last year three plainclothes officers were at the junior prom.

The seeds of the present conflict were planted a year ago when Paul Guilbert, then a junior at Cumberland High School, sought permission to bring a male escort to the junior prom. The principal, Richard Lynch (the defendant here), denied the request, fearing that student reaction could lead to a disruption at the dance and possibly to physical harm to Guilbert. The request and its denial were widely publicized and led to widespread community and student reaction adverse to Paul. Some students taunted and spit at him, and once someone slapped him; in response, principal Lynch arranged an escort system, in which Lynch or an assistant principal accompanied Paul as he went from one class to the next. No other incidents or violence occurred. Paul did not attend the prom. At that time Aaron Fricke (plaintiff here) was a friend of Paul's and supported his position regarding the dance.

This year, during or after an assembly in April in which senior class events were discussed, Aaron Fricke, a senior at Cumberland High School, decided that he wanted to attend the senior reception with a male companion. Aaron considers himself a homosexual, and has never dated girls, although he does socialize with female friends. He has never taken a girl to a school dance. Until this April, he had not "come out of the closet" by publicly acknowledging his sexual orientation.

Aaron asked principal Lynch for permission to bring a male escort, which Lynch denied. A week later (during vacation), Aaron asked Paul Guilbert—who now lives in New York—to be his escort (if allowed), and Paul accepted. Aaron met again with Lynch, at which time they discussed Aaron's commitment to homosexuality; Aaron indicated that although it was possible he might someday be bisexual, at the present he is exclusively homosexual and could not conscientiously date girls. Lynch gave Aaron written reasons for his action;[2] his

2. Principal Lynch sent the following letter to Aaron's home and handed it to him in person:

Dear Aaron:

This is to confirm our conversation of Friday, April 11, 1980, during which I denied your request to attend the Senior Reception on May 30, 1980 at the Pleasant Valley Country Club in Sutton, Massachusetts, accompanied by a male escort.

I am denying your request for the following reasons:

1. The real and present threat of physical harm to you, your male escort and to others;

2. The adverse effect among your classmates, other students, the School and the Town of Cumberland, which is certain to follow approval of such a request for overt homosexual interaction (male or female) at a class function;

3. Since the dance is being held out of state and this is a function of the students of Cumberland High School, the School Department is powerless to insure protection in Sutton, Massachusetts. That protection would be required of property as well as persons and would expose all concerned to liability for harm which might occur;

4. It is long standing school policy that no unescorted student, male or female, is permitted to attend. To enforce this rule, a student must identify his or her escort before the committee will sell the ticket.

I suspect that other objections will be raised by your fellow students, the Cumberland School Department, Parents and other citizens, which will heighten the potential for harm.

prime concern was the fear that a disruption would occur and Aaron or, especially, Paul would be hurt. He indicated in court that he would allow Aaron to bring a male escort if there were no threat of violence.

After Aaron filed suit in this Court, an event reported by the Rhode Island and Boston papers, a student shoved and, the next day, punched Aaron. The unprovoked, surprise assault necessitated five stitches under Aaron's right eye. The assailant was suspended for nine days. After this, Aaron was given a special parking space closer to the school doors and has been provided with an escort (principal or assistant principal) between classes. No further incidents have occurred.

This necessarily brief account does not convey the obvious concern and good faith Lynch has displayed in his handling of the matter. Lynch sincerely believes that there is a significant possibility that some students will attempt to injure Aaron and Paul if they attend the dance. Moreover, Lynch's actions in school have displayed a concern for Aaron's safety while at school. Perhaps—one cannot be at all sure—a totally different approach by Lynch might have kept the matter from reaching its present proportions, but I am convinced that Lynch's actions have stemmed—in significant part—from a concern for disruption.

Aaron contends that the school's action violates his first amendment right of association, his first amendment right to free speech, and his fourteenth amendment right to equal protection of the laws. (The equal protection claim is a "hybrid" one— that he has been treated differently than

others because of the content of his communication.)[3]

The starting point in my analysis of Aaron's first amendment free speech claim must be, of course, to determine whether the action he proposes to take has a "communicative content sufficient to bring it within the ambit of the first amendment." *Gay Students Organization v. Bonner*, 509 F.2d 652 (1st Cir. 1974) (hereinafter *Bonner*). As this Court has noted before, the "speech pure"/"speech plus" demarcation is problematic, both in logic and in practice. *Reilly v. Noel*, 384 F.Supp. 741 (D.R.I.1974); see cases cited therein. This normally difficult task is made somewhat easier here, however, by the precedent set in *Bonner, supra*. In that case, the University of New Hampshire prohibited the Gay Students' Organization (GSO) from holding dances and other social events. The first circuit explicitly rejected the idea that traditional first amendment rights of expression were not involved. 509 F.2d at 660. The Court found that not only did discussion and exchange of ideas take place at informal social functions, *id.* at 660–61, but also that:

> beyond the specific communications at such events is the basic "message" GSO seeks to convey—that homosexuals exist, that they feel repressed by existing laws and attitudes, that they wish to emerge from their isolation, and that public understanding of their attitudes and problems is desirable for society.

*Id.* at 661.

Here too the proposed activity has significant expressive content. Aaron testified

Should you wish to appeal my decision, you may appeal to the Superintendent of Schools, Mr. Robert G. Condon. You will be entitled to a hearing before him or his designee. If you are not satisfied with his decision, you may appeal to the Cumberland School Committee. You are entitled to be represented by counsel, to examine and cross examine witnesses and to present witnesses on your own behalf. Further procedural details may be obtained from the Superintendent's office.

If you have any further questions, please feel free to contact me. I am sending a copy of this letter to your parents in the event they wish to be heard.

Sincerely,
Richard B. Lynch
Principal

**3.** The plaintiff has not advanced the plausible arguments that homosexuals constitute a suspect class, *see* L. Tribe, *American Constitutional Law* (1978) at 944–45 n. 17, or that one has a constitutional right to be a homosexual, *see, e. g., Acanfora v. Board of Education*, 359 F.Supp. 843 (D.Md.1973), *aff'd on other grounds*, 491 F.2d 498 (4th Cir. 1974). The first amendment aspect of the case makes it unnecessary for me to reach these issues, although they may very well be applicable to this kind of case.

that he wants to go because he feels he has a right to attend and participate just like all the other students and that it would be dishonest to his own sexual identity to take a girl to the dance. He went on to acknowledge that he feels his attendance would have a certain political element and would be a statement for equal rights and human rights. Admittedly, his explanation of his "message" was hesitant and not nearly as articulate as Judge Coffin's restatement of the GSO's message, cited above. Nevertheless, I believe Aaron's testimony that he is sincerely—although perhaps not irrevocably—committed to a homosexual orientation and that attending the dance with another young man would be a political statement. While mere communicative intent may not always transform conduct into speech, *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968), *Bonner* makes clear that this exact type of conduct as a vehicle for transmitting this very message can be considered protected speech.[4]

Accordingly, the school's action must be judged by the standards articulated in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and applied in *Bonner*: (1) was the regulation within the constitutional power of the government; (2) did it further an important or substantial governmental interest; (3) was the governmental interest unrelated to the suppression of free expression; and (4) was the incidental restriction on alleged first amendment freedoms no greater than essential to the furtherance of that interest? *Bonner* at 662.

I need not dwell on the first two *O'Brien* requirements: the school unquestionably has an important interest in student safety and has the power to regulate students' conduct to ensure safety. As to the suppression of free expression, Lynch's testimony indicated that his personal views on homosexuality did not affect his decision, and that but for the threat of violence he would let the two young men go together. Thus the government's interest here is not in squelching a particular message because it objects to its content as such. On the other hand, the school's interest is in suppressing certain speech activity because of the reaction its message may engender. Surely this is still suppression of free expression.

It is also clear that the school's action fails to meet the last criterion set out in *O'Brien*, the requirement that the government employ the "least restrictive alternative" before curtailing speech. The plaintiff argues, and I agree, that the school can take appropriate security measures to control the risk of harm. Lynch testified that he did not know if adequate security could be provided, and that he would still need to sit down and make the necessary arrangements. In fact he has not made any effort to determine the need for and logistics of additional security. Although Lynch did not say that any additional security measures would be adequate, from the testimony I find that significant measures could be taken and would—in all probability—critically reduce the likelihood of any disturbance. As Lynch's own testimony indicates, police officers and teachers will be present at the dance, and have been quite successful in the past in controlling whatever problems arise, including unauthorized drinking. Despite the ever-present possibility of violence at sports events, adequate discipline has been maintained. From Lynch's testimony, I have every reason to believe that additional school or law enforcement personnel could be used to "shore up security" and would be effective. It should also be noted that Lynch testified that if he considered it impossible to provide adequate security he would move to

---

4. The defendant argues that Aaron has selected an inappropriate time and place for his speech activity. Admittedly, Aaron seeks to express a political message in a social setting. His message, however, will take a form uniquely consonant with the setting—he wishes to attend and participate like everyone else. Thus, while a purer form of speech—such as leafleting or speechmaking—might legitimately be barred at a dance, prohibiting Aaron's attendance does not fall within the rubric of a time, place, and manner restriction. This is especially so because the school's action is not entirely content-neutral. See note 5 and p. 385, *supra*.

cancel the dance. The Court appreciates that controlling high school students is no easy task. It is, of course, impossible to guarantee that no harm will occur, no matter what measures are taken. But only one student so far has attempted to harm Aaron, and no evidence was introduced of other threats. The measures taken already, especially the escort system, have been highly effective in preventing any further problems at school. Appropriate security measures coupled with a firm, clearly communicated attitude by the administration that any disturbance will not be tolerated appear to be a realistic, and less restrictive, alternative to prohibiting Aaron from attending the dance with the date of his choice.

 The analysis so far has been along traditional first amendment lines, making no real allowance for the fact that this case arises in a high school setting. The most difficult problem this controversy presents is how this setting should affect the result. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), makes clear that high school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506, 89 S.Ct. at 736. As the *Tinker* Court stated:

> But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained. *Burnside v. Byars* [363 F.2d 744] . . . . .

*Tinker* at 508–09, 89 S.Ct. at 737–738. Numerous other courts have recognized and enforced students' rights to free expression inside and outside the classroom. *E.g., Shanley v. Northeast Independent School District*, 462 F.2d 960 (5th Cir. 1972); *Butts v. Dallas Independent School District*, 436 F.2d 728 (5th Cir. 1971); *Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966).

*Tinker* did, however, indicate that there are limits on first amendment rights within the school:

> A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others. *Burnside v. Byars, supra*, at 749. *But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. Cf. Blackwell v. Issaquena County Board of Education*, 363 F.2d 749 (C.A. 5th Cir. 1966).

*Tinker* at 513, 89 S.Ct. at 740 (emphasis added).

It seems to me that here, not unlike in *Tinker*, the school administrators were acting on "an undifferentiated fear or apprehension of disturbance." True, Aaron was punched and then security measures were taken, but since that incident he has not been threatened with violence nor has he been attacked. There has been no disruption at the school; classes have not been cancelled, suspended, or interrupted. In short, while the defendants have perhaps shown more of a basis for fear of harm than in *Tinker*, they have failed to make a "showing" that Aaron's conduct would "materially and substantially interfere" with school discipline. *See Tinker* at 509, 89 S.Ct. at 737. However, even if the Court assumes that there is justifiable fear and that Aaron's peaceful speech leads, or may lead, to a violent reaction from others, the question remains: may the school prohibit the speech, or must it protect the speaker?

■ It is certainly clear that outside of the classroom the fear—however justified—of a violent reaction is not sufficient reason to restrain such speech in advance, and an actual hostile reaction is rarely an adequate basis for curtailing free speech. *Gregory v. City of Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Collin v. Chicago Park District*, 460 F.2d 746 (7th Cir. 1972); *Williams v. Wallace*, 240 F.Supp. 100 (M.D.Ala.1965). Thus, the question here is whether the interest in school discipline and order, recognized in *Tinker*, requires a different approach.

■ After considerable thought and research, I have concluded that even a legitimate interest in school discipline does not outweigh a student's right to peacefully express his views in an appropriate time, place, and manner.[5] To rule otherwise would completely subvert free speech in the schools by granting other students a "heckler's veto," allowing them to decide—through prohibited and violent methods—what speech will be heard. The first amendment does not tolerate mob rule by unruly school children. This conclusion is bolstered by the fact that any disturbance here, however great, would not interfere with the main business of school—education. No classes or school work would be affected; at the very worst an optional social event, conducted by the students for their own enjoyment, would be marred. In such a context, the school does have an obligation to take reasonable measures to protect and foster free speech, not to stand helpless before unauthorized student violence.

5. The second reason relied upon by the *Bonner* court in finding the GSO social events to be speech-related was the interpretation placed upon those events by the community. There the university prohibited the gay social events because the community considered them "shocking and offensive," "a spectacle, an abomination," an "affront" to townspeople, "grandstanding," inflammatory, "undermin[ing] the university within the state," and distasteful. The first circuit concluded that "[w]e do not see how these statements can be interpreted to avoid the conclusion that the regulation imposed was based in 'large measure, if not exclusively, on the content of the GSO's expression.'" *Bonner* at 661. I quite agree that these statements of community outrage indicate that the *content*, i. e. the homosexual-ness, of the GSO's activities led to the strong reaction and the prohibition, not the fact that they were dances. With all due respect, however, I am puzzled by how this reaction proves the *expressive* nature of these activities. Community outrage per se does not transform conduct into speech, or even indicate that it is speech; communities have reacted with outrage similar to that of the citizens of New Hampshire to such non-expressive activities as Hester Prynne's adultery, the dumping of chemicals into Love Canal, and the Son of Sam murders. It is hard in *Bonner* to separate the community's opposition to the GSO's acts from its opposition to its message (if the acts had a message); surely they opposed both. Same-sex dancing may have an expressive element, but it is also action, and potentially objectionable as such.

Insofar as *Bonner* directs me to consider community reaction in assessing expressive content, I conclude that the community disapproves of the content of Aaron's message and that the vehemence of their opposition to his intended escort is based in part on this disapproval of what he is trying to communicate. The school here professes to be unconcerned with the content of the plaintiff's message, but their concern with townspeople's reaction is, indirectly, content-related.

This holding is supported by other cases that have considered the problem, although they were not actually confronted with a reasonable expectation of a disturbance. In *Butts v. Dallas Independent School District*, 436 F.2d 728, 732 (5th Cir. 1971), the fifth circuit protected the wearing of black armbands saying:

> we do not agree that the precedential value of the *Tinker* decision is nullified whenever a school system is confronted with disruptive activities or the possibility of them. Rather we believe that the Supreme Court has declared a constitutional right which school authorities must nurture and protect, not extinguish, unless they find the circumstances allow them no practical alternative.

Judge Goldberg's well reasoned and eloquent opinion in *Shanley v. Northeast Independent School District*, 462 F.2d 960, 973–74 (5th Cir. 1972), upholding the right of high school students to write and distribute a newspaper off school grounds, asserted:

> However, we must emphasize in the context of this case that even reasonably forecast disruption is not per se justification for prior restraint or subsequent punishment of expression afforded to students by the First Amendment. If the content of a student's expression could give rise to a disturbance from those who hold opposing views, then it is certainly within the power of the school administration to regulate the time, place, and manner of distribution with even greater latitude of discretion. And the administration should, of course, take all reasonable steps to control disturbances, however generated. We are simply taking note here of the fact that disturbances themselves can be wholly without reasonable or rational basis, and that those students who would reasonably exercise their freedom of expression should not be restrained or punishable at the threshold of their attempts at expression merely because a small, perhaps vocal or violent, group of students with differing views might or does create a disturbance. (Citations omitted.)

■ The present case is so difficult because the Court is keenly sensitive to the testimony regarding the concerns of a possible disturbance, and of physical harm to Aaron or Paul. However, I am convinced that meaningful security measures are possible, and the first amendment requires that such steps be taken to protect—rather than to stifle—free expression. Some may feel that Aaron's attendance at the reception and the message he will thereby convey is trivial compared to other social debates, but to engage in this kind of a weighing in process is to make the content-based evaluation forbidden by the first amendment.

As to the other concern raised by *Tinker*, some people might say that Aaron Fricke's conduct would infringe the rights of the other students, and is thus unprotected by *Tinker*. This view is misguided, however. Aaron's conduct is quiet and peaceful; it demands no response from others and—in a crowd of some five hundred people—can be easily ignored. Any disturbance that might interfere with the rights of others would be caused by those students who resort to violence, not by Aaron and his companion, who do not want a fight.

■ Because the free speech claim is dispositive, I find it unnecessary to reach the plaintiff's right of association argument or to deal at length with his equal protection claim.[6] I find that the plaintiff has estab-

---

**6.** This case can also be profitably analyzed under the Equal Protection Clause of the fourteenth amendment. In preventing Aaron Fricke from attending the senior reception, the school has afforded disparate treatment to a certain class of students—those wishing to attend the reception with companions of the same sex. Ordinarily, a government classification need only bear a rational relationship to a legitimate public purpose; only where the clas-

sification encompasses a suspect class or burdens a fundamental right is the government held to a stricter standard of justification. Counsel have conceded that homosexuals are not a suspect class sufficient to trigger a higher standard of scrutiny. As noted above, however, there is a significant first amendment component to Aaron's desire to attend the reception with another male. Where, as here, government classification impinges on a first

lished a probability of success on the merits and has shown irreparable harm; accordingly his request for a preliminary injunction is hereby granted.

As a final note, I would add that the social problems presented by homosexuality are emotionally charged; community norms are in flux, and the psychiatric profession itself is divided in its attitude towards homosexuality. This Court's role, of course, is not to mandate social norms or impose its own view of acceptable behavior. It is instead, to interpret and apply the Constitution as best it can. The Constitution is not self-explanatory, and answers to knotty problems are inevitably inexact. All that an individual judge can do is to apply the legal precedents as accurately and as honestly as he can, uninfluenced by personal predilections or the fear of community reaction, hoping each time to disprove the legal maxim that "hard cases make bad law."

John Gent, Erie, Pa., for plaintiffs.

John Beatty, Erie, Pa., for defendants.

Donald Bebenek, Pittsburgh, Pa., Charles D. Marlett, Erie, Pa., for third party defendant.

amendment right, the government is held to a higher level of scrutiny. *Chicago Police Department v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Reilly v. Noel*, 384 F.Supp. 741 (D.R.I.1974).

I find that principal Lynch's reason for prohibiting Aaron's attendance at the reception—the potential for disruption—is not sufficiently compelling to justify a classification that would abridge first amendment rights.