### PYEATTE v. BOARD OF REGENTS OF UNIVERSITY OF OKLAHOMA et al.

Civ. No. 5238.

District Court of the United States
W. D. Oklahoma.

Dec. 18, 1951.

Judgment Affirmed March 3, 1952.

See 72 S.Ct. 567.

Paul W. Updegraff, Norman, Okl., for plaintiff.

Mac Q. Williamson, Atty. Gen., State of Oklahoma, Fred Hansen, Asst. Atty. Gen. State of Oklahoma, George Fraser, Jr. and John B. Cheadle, Norman, Okl., for defendants.

Before MURRAH, Circuit Judge, and VAUGHT and WALLACE, District Judges.

WALLACE, District Judge.

This is a class action for an interlocutory injunction and a permanent injunction to restrain the enforcement of a ruling of an administrative board acting under and by authority of a State statute. The jurisdiction of the court is invoked under the Judicial Code, 28 U.S.C.A. § 1343(3) and 28 U.S.C.A. § 2281.

The plaintiff in this class action seeks an injunction to prevent the enforcement of

certain rules promulgated by the Board of Regents of the University of Oklahoma, contending that the enforcement of such rules denies the liberties of the plaintiff and others in a similar situation as guaranteed by the Fourteenth Amendment of the Constitution of the United States.

The facts are as follows:

The University of Oklahoma is located at Norman, Oklahoma. It is a part of the educational system of the State and is maintained and operated from public funds raised by taxation from the citizens and taxpayers of the State. The government of the University is vested in a Board of Regents with authority delegated to do everything necessary to accomplish the objects of the school, not expressly or impliedly prohibited.

The defendant University of Oklahoma Housing Authority was created by Title 70 O.S.A. § 1306.1, designated as a body corporate, and given the power to erect dormitories, and create and furnish dining facilities. By Title 70 O.S.A. § 1306.3, the membership of the Board of Directors of the University Housing Authority was made identical with the Board of Regents of the University. Subsequent to the statutory provisions above, other statutes became effective which dealt in substance with the same subject matter, but were broader in scope and contained many new provisions. This later legislation is contained in Title 70 O.S.A. §§ 2071 to 2080, passed in 1945 and later amended in 1947. The provisions of the original Act of 1945 and the amendment in 1947 are for all practical purposes and for the purposes of this litigation, the same.

The 1945 Act, both before and after its amendment, authorizes both the Board of Regents of the University of Oklahoma and the Board of Regents of the Oklahoma Agricultural and Mechanical Colleges to set aside such portions of their respective campuses as may be necessary and suitable for the construction thereon of dormitories, kitchens, and other self liquidating projects, and other revenue producing buildings including additions to existing buildings used for such purposes and to construct such buildings or additions thereon and to equip, furnish, maintain and operate such buildings. The Act also provides for authorization by the Board of Regents to issue bonds for the purpose of paying the cost of the above projects and "to provide for the payment" thereof. Another provision of the Act provides that said bonds shall be paid "solely from the revenues to be derived from the operation of" said dormitories and other buildings, same to be pledged "to the payment of principal of and interest on the bonds."

In furtherance of the statutory provisions and in order to meet the obligations of any bonds which were issuable under the authority delegated to the Board of Regents, Title 70 O.S.A. § 2073 provides as follows:

"* * * In order to secure the prompt payment of such principal and interest and the proper application of the revenues pledged thereto, the board is authorized by appropriate provisions in the resolution or resolutions authorizing the bonds:

*　　*　　*　　*　　*　　*

"(f) To fix rents, charges and fees to be imposed in connection with and for the use of the building and the facilities supplied thereby, which rents, charges and fees shall be considered to be income and revenues derived from the operation of the building, and are hereby expressly required to be fully sufficient to assure the prompt payment of principal and interest on the bonds as each becomes due, and to make and enforce such rules and regulations with reference to the use of the building, and with reference to requiring any class or classes of students to use the building as it may deem desirable for the welfare of the institution and its students or for the accomplishment of the purposes of this act;

"(g) to covenant to maintain a maximum percentage of occupancy of the building;"

*　　*　　*　　*　　*　　*

The Board of Regents of the University of Oklahoma adopted a Resolution Of Student Housing on September 10, 1947, amended February 14, 1948, which provides as follows:

*　　*　　*　　*　　*　　*

"(1) That all undergraduate, unmarried students be required to live in University-operated dormitories to the extent that such dormitory rooms are available on the Main Campus of the University; provided that such requirement shall not apply to undergraduate, unmarried students who (a) live with parents or other relatives in Norman or (b) commute from a place of residence outside Norman or (c) work for room in lieu of paying rent; and provided further that such requirement shall not apply to students who live in a fraternity, sorority or approved student cooperative house, except that all freshman women students not in categories (a), (b) or (c) above shall live in University-operated dormitories to the extent such facilities are available.

"(2) That all undergraduate, married students living in Norman with husband or wife be required to live in University operated family dwelling units in Sooner City, Boyd House, and Niemann Apartments to the extent that such family dwelling units are available, provided that such requirements shall not apply to undergraduate, married students who (a) live with parents or other relatives in Norman (b) work for living quarters in lieu of paying rent or (c) own and occupy their homes in Norman."

\* \* \* \* \* \*

There are specific exemptions from housing regulations as to married students with children, all graduate students and in special cases of hardship exceptions are made for individuals.

It is a prerequisite that all persons who seek enrollment in the University of Oklahoma comply with the Housing Regulations before they are permitted to attend the University.

The plaintiff in this case is a resident of Norman, Oklahoma, a taxpayer of the State and is engaged in the rooming and boarding house business. Prior to 1947, students in attendance at the University were permitted to live in approved rooming and boarding houses, fraternity and sorority houses, private dormitories, and dormitories maintained and operated by the University of Oklahoma, all under the supervision and control of the University of Oklahoma.

The home of the plaintiff was one of the private homes that was approved by the authorities for the keeping of male students in attendance at the University. In other words, her home met the specifications and requirements exacted by the Board of Regents for the housing of students.

The statutory provisions passed by the Legislature and set out above were for the purpose of delegating to the Board of Regents of the University the power to take steps to insure adequate facilities for the housing of students who would then and in the future attend the University of Oklahoma. The Housing Regulations were promulgated and put into force and effect as a means for accomplishing the end in view.

Under the Housing Regulations as they now exist, plaintiff finds herself in the position where facilities of the University and other approved dormitories such as fraternities and sororities are adequate to house all or a great majority of the university students. As a result, plaintiff has difficulty, if not finding it impossible, to fill her rooms with students. It is the contention of the plaintiff that the defendants are violating her constitutional rights in the following particulars:

(1) That the rules pertaining to housing of students which are or were allegedly promulgated under and by authority of the statutes set out above, insofar as they prevent contractual relations from being entered into between members of the student body of the University of Oklahoma and the plaintiff, deprive the plaintiff of her liberty to contract and her property without due process of law, contrary to the Fourteenth Amendment of the Constitution of the United States.

(2) That the rules, insofar as they permit fraternal organizations, and a dormitory known as Newman Hall run by a religious organization, to contract with students for their room and board, while denying a similar privilege to the plaintiff, are unreasonable, arbitrary, and discriminatory, and deny to the plaintiff the equal protection of the laws.

The Fourteenth Amendment of the federal Constitution provides in part:

" * * * nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It is this part of the Constitution upon which the plaintiff relies. It is undoubtedly true that the right to contract is both a liberty and a property right within the protection of the Fourteenth Amendment to the federal Constitution. Holden v. Hardy, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780; Allgeyer v. State of Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832. It is also true that the same limitations are placed upon administrative agencies of the State as are applicable to the direct action of the State. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987.

■ Plaintiff has overlooked entirely the fact that the right to contract is not an absolute right and that a State may validly limit or in some cases effectively prohibit contractual relations. As was so aptly stated by Mr. Justice Holmes in Block v. Hirsh, 256 U.S. 135, 155, 41 S.Ct. 458, 65 L.Ed. 865; and quoted with approval in Bowles v. Willingham, 321 U.S. 503, 518, 519, 64 S.Ct. 641, 649, 88 L.Ed. 892: "The fact that tangible property is also visible tends to give a rigidity to our conception of our rights in it that we do not attach to others less concretely clothed. But the notion that the former are exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay."

■ The enactment of statutes, or rules and regulations promulgated under authority of statute, invariably involve a modification of existing private rights and privileges of at least some persons. The due process clause does not prevent extensive governmental control of private interests for the protection and welfare of the public at large. It is quite impossible to draw a distinct line between the permissible and the prohibited forms of regulation to which the due process clause applies and in the final analysis of judicial construction of constitutional provisions, it becomes necessary to weigh the individual interests against the social desirability of governmental control or regulations which may or do affect those interests. A general rule has developed for reconciling the claims of government to regulate, and those of private interests to freedom from regulation, as pertaining to due process, and this is that due process is a guarantee only against unreasonable and arbitrary legislative or other governmental control. Nebbia v. State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940.

Many times legislation is upheld upon the theory that regulatory measures in a certain degree are permissible under the "police power" of the state. Not all legislation or administrative rulings need rely upon or be "justified" upon the theory of police power. As was said by Mr. Justice Holmes, dissenting in Tyson Bros. v. Banton, 273 U.S. 418, 445, 47 S.Ct. 426, 433, 71 L.Ed. 718: " * * * police power often is used in a wide sense to cover and, as I said, to apologize for the general power of the Legislature to make a part of the community uncomfortable by a change."

■ It is immaterial whether the terminology used is police power or the general power of the Legislature, since the issue as to whether or not due process has been denied to the plaintiff hinges upon whether or not the statutes and rules are arbitrary, unreasonable, or capricious. When inquiring into the reasonableness of an act, the court must evaluate the benefit to be derived from upholding the statute or regulation and the loss suffered or likely to be suffered by a resulting deprivation of some private interest. In analyzing reasonableness of an act, several elements should be considered:

* * * * * *

" * * * The conditions existing prior to the legislation, the effectiveness of the new rule to improve them, the deprivation resulting from the new rule, and the possibility of achieving the same benefits at a

lower price." From a Note, "The Consideration of Facts in 'Due Process' Cases," 30 Columbia Law Review 360, 362 (1930).

Title 70 O.S.A. § 1218 provides as follows: "The said board of regents shall make rules, regulations and by-laws for the good government and management of the university and of each department thereof; prescribe rules and regulations for the admission of students * * *."

Over and above the express power conferred upon the Board of Regents by the statutory provision, the Oklahoma Constitution also provides for government of the University by the Board of Regents. Article 13, § 8, Oklahoma Constitution. The term "government" is very broad and necessarily includes the power to pass all rules and regulations which the Board of Regents considers to be for the benefit of the health, welfare, morals and education of the students, so long as such rules are not expressly or impliedly prohibited. Rheam v. Board of Regents of University of Oklahoma, 161 Okl. 268, 18 P.2d 535.

It cannot be questioned that proper housing for students is an integral part of the responsibility placed upon the authorities of the University of Oklahoma. The great majority of the students must have a home away from home while attending school at the University, and it is incumbent upon school authorities to see that all precautions are taken to insure that not only adequate but also suitable housing is available.

As heretofore stated, before a student is permitted to attend classes at the University, he must comply with the Housing Regulations. This has the effect of being a condition precedent to enrollment in the University. There is no absolute and unequivocal right belonging to any individual to attend the University free of any restrictions or rules pertaining to admission. The Board of Regents has found it desirable, expedient and for the good of the University as well as the students to require them to live in the designated housing insofar as it is available. To accomplish the end in view, the housing regulations were put into effect as part of the requirement for admission to the University.

The Supreme Court of the United States has had occasion in at least two cases to rule upon regulations of state universities concerning requisites of admission. In the case of Waugh v. Board of Trustees of the University of Mississippi, 237 U.S. 589, 35 S.Ct. 720, 722, 59 L.Ed. 1131, the Supreme Court affirmed the decision of the Mississippi State Court which held a student could not take part in certain activities while attending the University of Mississippi unless all affiliation with any Greek letter college fraternity was renounced. In the opinion on appeal to the United States Supreme Court, it was held:

"The next contention of complainant has various elements. It assails the statute as an obstruction to his pursuit of happiness, a deprivation of his property and property rights, and of the privileges and immunities guaranteed by the Constitution of the United States. Counsel have considered these elements separately and built upon them elaborate and somewhat fervid arguments, but, after all, they depend upon one proposition: whether the right to attend the University of Mississippi is an absolute or conditional right.

* * * * * *

"This being our view of the power of the legislature, we do not enter upon a consideration of the elements of complainant's contention. It is very trite to say that the right to pursue happiness and exercise rights and liberty are subject in some degree to the limitations of the law, and the condition upon which the state of Mississippi offers the complainant free instruction in its University, that while a student there he renounce affiliation with a society which the state considers inimical to discipline, finds no prohibition in the 14th Amendment."

In the case of Hamilton v. Regents of the University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343, the Supreme Court of the United States again held that a university could make regulations that students must meet as a condition precedent to attendance. In this case it was held that a conscientious objector could be excluded from the university if he did not take military education.

In Hoyt v. Trustees of State Normal School, 96 Colo. 442, 44 P.2d 513, 514, the Supreme Court of Colorado, speaking of a bond issue and regulations pertaining thereto, said:

" * * * Principal and interest are payable from, and to be secured by, a first and exclusive charge on the net revenues of the project to be constructed. The revenues are to be obtained from charges made to first year students who are to be required to reside in the dormitories, and in the event there is an insufficient number of first year students to fill to capacity, then upper class girls will be required to reside therein. * * *

* * * * * *

"It undoubtedly is within the controlling power delegated to the board of trustees to promulgate and enforce reasonable rules for the conduct and discipline of the institution. Plaintiffs object to the action of the board in contracting with the government to adopt and enforce rules and regulations, for revenue raising purposes, requiring students to occupy the dormitories at arbitrarily fixed rates, and insist that such rules infringe upon the constitutional guaranty of the liberty to contract for such, by the students or those acting for and in their behalf. Such objection, presented by plaintiffs as taxpayers, house owners, and boarding house keepers, is without force and effect here. If it could effectively be made, and we do not decide whether it could or could not be successfully interposed by proper parties, we are of the opinion and so decide, that it is without force when presented by plaintiffs in the capacity in which they appear in this suit. They do have the capacity, if they have a cause of action, to maintain such against the creation of an indebtedness and the pledging of the credit of the state, contrary to and beyond the constitutional and statutory limitations. The trial court, upon the pleadings and the evidence, determined that plaintiffs had no such cause of action, which determination we find is amply supported by the evidence and the law."

Plaintiff does not challenge the authority of the University of Oklahoma to issue rules to govern admission to the University, but contends that the effect of the rules is to prevent her from contracting with the students for room and board and that such prevention is a violation of her liberty to contract. (Plaintiff also has another contention which will be considered later.) In order to sustain this somewhat dubious approach, the plaintiff has placed herself in an anomalous position. On the one hand there is an admission that reasonable rules for admission to the University are proper and valid and in the next breath it is contended that her rights to contract have been denied by the very same rules which are proper and valid. Counsel for plaintiff evidently foresaw this position and has fallen back upon the trite phrase that "a state cannot do indirectly what it cannot do directly". The distinction between those cases where such a phrase is applicable and the case at bar is so obvious as to merit absolutely no consideration.

The plaintiff has not in any way had her rights to contract for roomers and boarders impaired. It is true and regrettable that a certain number of persons designated as students are not available for taking the rooms offered by the plaintiff. This state of affairs was brought about by the Housing Regulations and does affect the plaintiff adversely, but when a state acting in a proper sphere passes regulations which are valid and suitable to attain a desired end, the mere fact that such legislation or regulatory measures has an incidental effect upon a few individuals, does not make the regulation invalid or abridge the constitutional rights of the individual. Stating it another way, the effect of the Housing Resolution does not destroy the plaintiff's right to contract with respect to her property. It does not forbid her to contract with any student. It merely creates a condition of affairs which renders the making of a related contract, lawful in itself, ineffective, and this is not fatal to its constitutionality. Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 56 S. Ct. 513, 80 L.Ed. 772.

The Constitution of the United States guarantees to all persons certain liberties,

but many times these liberties must give way in part to co-existing or co-equal rights invested in others. It would appear that if any right has been violated, it would be the right of the student to contract for a place to live of his own choice and not a right of a person in the position of the plaintiff. Even so, as stated in Alaska Packers Ass'n v. Industrial Accident Commission of California, 294 U.S. 532, 543, 55 S.Ct. 518, 522, 79 L.Ed. 1044: "Legislation otherwise within the scope of acknowledged state power, not unreasonable or arbitrarily exercised, cannot be condemned because it curtails the power of the individual to contract."

The Housing Regulations in effect at the University of Oklahoma result in completely depriving a student of freely contracting with whom he pleases for a place to live. If this restriction upon the student is a valid exercise of the power conferred upon the Board of Regents to prescribe rules for admission to the University, it is absurd for the plaintiff to contend that the indirect effect deprives her of her liberty to contract, for the fact that regulatory law enacted under state power imposes hardship in individual cases, due to special circumstances or other factors, does not subject the law to constitutional objections.

There is a presumption of the validity of state statutes or regulations passed by an administrative agency acting by authority delegated to the agency. If there is any state of facts which tends to support the regulatory measures and such measures are not clearly unreasonable or arbitrary, then the statute or regulation will be upheld as being constitutional. This court cannot, in light of the evidence and in contravention of the good judgment of the Board of Regents of the University of Oklahoma, say that the action taken was unreasonable or arbitrary. The state has a decided interest in the education, well-being, morals, health, safety and convenience of its youth. When a situation arises where it becomes necessary to expend great sums for buildings to house students, it is within the power of the state acting through an administrative agency to provide such facilities, and when it is necessary for rules to be passed to provide payment for such buildings in furtherance of the object to be accomplished, such rules will be valid as a means accompanying the over-all policy of furnishing the needed facilities.

The question thus "do the statutes and rules involved here deprive the plaintiff of any property right without due process of law?" must be answered in the negative.

There is one further contention of the plaintiff which requires more consideration than the contention of a violation of her liberty to contract heretofore disposed of. This second contention is that plaintiff has been discriminated against without equal protection of the laws. Plaintiff bases this contention upon the ruling by the University that students may live in sorority or fraternity houses and Newman Hall, but cannot live in private homes approved by the University for the housing of students until university housing is filled.

It would appear here, as in the preceding discussion, that if any discrimination is involved, and we do not pass upon this point, it is against the students and not against the private home owners such as the plaintiff. Thus the plaintiff would not be in a position to challenge the constitutionality of the statutes or regulations promulgated under and by force of the power conferred upon the Board of Regents by such statutes. However, the plaintiff has raised the issue of discrimination against herself as a private householder duly approved by the University to keep students and other private organizations such as fraternal organizations and Newman Hall owned by the Catholic Church. There is a substantial issue raised in this respect and the court must consider it with all due deference to the rights of plaintiff.

Substantive due process and equal protection of the laws are very similar in many respects. However, as stated in Rottschaefer on Constitutional Law, 1st Ed. (1939): "There is a marked difference between the protection accorded individual interests by the due process and equal protection clauses of the Fourteenth Amendment. The former limits the general character of regulation that may be

imposed on conduct even when it is applied to every case in which the regulated conduct occurs; the latter is a limit merely on the power of making classifications in the enactment and enforcement of regulatory legislation. A regulation violates the former if it is arbitrary and unreasonable, but can violate the latter only if the group subjected to it has been arbitrarily selected and defined."

In the case of Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369, certain rules were enumerated by which the equal protection contention is to be tested. These rules are as follows: "1. The equal-protection clause of the 14th Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. 2. *A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality.* 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." (Emphasis added.)

The Fourteenth Amendment is thus not an absolutely inflexible and austere requirement of the impracticable. Equal protection of the law does not guarantee that every business or occupation that is similar must be treated in the precise manner as all others. As stated in Armour & Co. v. State of North Dakota, 240 U.S. 510, 517, 36 S.Ct. 440, 443, 60 L.Ed. 771, referring to the power of the State in making classifications: "The power may be determined by degrees of evil, or exercised in cases where detriment is especially experienced."

The court in its consideration or treatment of any particular basis of classification must ultimately refer to the problem in connection with which it was made. The record discloses that at the time the rules and regulations were promulgated there were between twelve and thirteen thousand students enrolled, with over a thousand students without proper or available accommodations, besides those commuting from other places. What brought about the condition, aside from the school outgrowing the community, is more or less speculative, but it can be fairly inferred it resulted by war activities that required housing units and living quarters in the community surrounding the University. The plaintiff would be an exception to the general run of landlords if she did not take advantage of such a situation.

The University in its over-all program for housing facilities has evidently come to rely in great measure upon the fraternal dormitories and Newman Hall as a complement to the housing owned and managed by the University itself. These dormitories are not available for any purpose other than housing students, and past experience indicates that they will be available to the University at all times. On the other hand, the private homes such as that owned by the plaintiff are not an integral part of the housing program but are furnished mainly for the purpose of earning for the benefit of the private owner. The private home owners may at any time use their homes for a variety of purposes and without any restrictions may deny their use to the University for the housing of students. It is true that many private homes were used in the past for the purpose of housing facilities for students and for this the private home owners are to be commended. However, it appears that in the light of the over-all picture the classification which has been made by the University Board of Regents is a reasonable one and not arbitrarily or capriciously exercised to deny to the plaintiff the equal protection of the laws.

The relief sought is denied and the action is dismissed.