The GAY ACTIVISTS ALLIANCE, Appellant,

v.

The BOARD OF REGENTS OF the UNIVERSITY OF OKLAHOMA, a body corporate; Paul Sharp, President of the University of Oklahoma; Bob Mitchell; K. D. Bailey; Richard Alan Bell; Dee A. Replogle, Jr.; Charles F. Engleman and Mack Braly, Appellees.

No. 52739.

Supreme Court of Oklahoma.

Dec. 22, 1981.

1. Quoted with approval in *Green v. Huff*, Okl., 636 P.2d 907, (1981).

Glenn Rawdon, Rawdon & Salem, Norman, for appellant.

Kurt F. Ockershauser, Stanley M. Ward, Susan Seamans, Legal Counsel, Norman, for appellees.

HARGRAVE, Justice.

On October 5, 1976, the Gay Activists Alliance (GAA) an association of students duly enrolled in the University of Oklahoma, submitted an application for recognition as a student organization by the University of Oklahoma Student Association to the University's student Attorney General as required by Section 13 of the Constitution of the University of Oklahoma Student Code of Responsibility and Conduct (the Code). Section 13 of the Code provides:

Groups of students who wish to form an organization may do so by fulfilling the following requirements:

A. A group of ten or more students may apply for the recognition of a new student organization on the appropriate application form to be obtained from the attorney general.

B. The completed application form, together with two copies of the by-laws, is filed with the attorney general, who shall recommend action in the Student Congress.

C. All changes and amendments to the constitution or by-laws must be submitted within one week after they become effective.

D. Before any organization may be considered for recognition, it must obtain an advisor who is a fulltime member of the faculty or staff.

Pursuant to this section, the application was accompanied by a list of names of more than ten students, by the name of the faculty advisor, and by the copies of the GAA by-laws. The application was filed with and was accepted by the student Attorney General and was submitted for approval to the University of Oklahoma Student Association Congress (Student Congress). On October 26, 1976, the Student Congress refused to recognize the GAA as a student organization.

On November 16, 1976, the GAA was again refused recognition by the Student Congress, whereupon the GAA appealed the decision of the Superior Court to the University of Oklahoma Judicial Tribunal. The Tribunal issued a requested writ of mandamus, directed the Student Congress to recognize the GAA, and censured the Superior Court for failing to follow the order of the Tribunal.

On January 3, 1977, despite the Tribunal's directive to recognize the GAA, the Student Congress failed to grant recognition and the Congress itself appealed the Tribunal's order to the Office of the President. The then acting President, Barbara Vehling, referred the matter to the University's Board of Regents through the Student Affairs Committee. The Board of Regents is the authorized governing body of the University. Okla.Const.Art. 13, § 8; 70 O.S. §§ 3301 et seq.

On February 10, 1977, the Regents, meeting as a Board, heard a debate of the recognition issue and rejected a motion for recognition. The Board is the highest body of appeal within the university system and is the final administrative authority with regard to the university. The plaintiff GAA had then exhausted all administrative remedies. On February 15, 1977, relief was sought by the GAA in the District Court of Cleveland County, Oklahoma.

The GAA and its president, John Mehring, alleging a denial of constitutional rights and a violation of civil rights, brought suit against the Board of Regents,[1] a body corporate, and the members of the Board of Regents as individuals, seeking alternatively a writ of mandamus requiring the defendants to recognize the GAA as an official student organization of the university or a mandatory injunction enjoining the defendant Board from failing to recognize the GAA. Actual damages in the amount of $10,000 and punitive damages in

---

1. Paul Sharp, President of the University, was named a defendant. However, no allegations were made against him as all actions relevant to the suit were taken by the acting president, Barbara Vehling.

the amount of $100,000 were sought in addition to attorney's fees in the amount of $2,500. The only evidentiary hearing occurred on February 25, 1977, as a hearing on the issue of the propriety of a temporary injunction. The parties submitted the case on exhibits and written stipulations of fact.

On August 10, 1978, the presiding judge, The Honorable Alma Wilson, entered a memorandum opinion denying the injunction and the requested damages. Thereupon the GAA on September 11, 1978, appealed to this Court seeking a reversal of the District Court's decision and alleging that the denial of recognition of the GAA violated GAA members' First and Fourteenth Amendment rights and that the GAA members were entitled to damages for such violations.

Fourteenth Amendment equal protection rights were not presented or briefed by either party and therefore the Constitutional argument is limited to a discussion of First Amendment rights as incorporated through the due process clause of the Fourteenth Amendment. *DeJonge v. Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937); *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

The GAA argues that the denial of recognition as a student organization by the University Regents violates its constitutionally guaranteed First Amendment rights of speech and assembly and as such the penumbral right of association, which does not trace its origin to the cultural or legal heritage of this country but rather owes its existence to Supreme Court interpretations of the First Amendment. See *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958). Although the Supreme Court has never addressed the question of the denial of recognition in the context presented today, it has addressed the question of the denial of recognition and its impact on these constitutionally-protected rights in *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), and has framed and determined what this Court considers the issue to be in the case at bar. It is not, as the District Court has

stated, whether there is a constitutional guarantee against discrimination with reference to sexual orientation or sex preferences. It is instead whether constitutional guarantees found in the First Amendment are violated when student organizations, after complying with university procedural requirements, are denied recognition due to the content of the message espoused by the organization.

In *Healy v. James, supra*, a group of students attending Central Connecticut State College, a state-supported institution, desired to form a local chapter of Students for a Democratic Society (SDS), and sought recognition by the college. The institution's president disagreed strongly with the destructive and violent philosophies advocated by the national SDS and refused to recognize a local chapter. The Supreme Court ruled that "[t]he mere disagreement of the President with the group's philosophy affords no reason to deny its recognition. As repugnant as these views may have been . . . the mere expression of them would not justify the denial of First Amendment rights. Whether petitioners did in fact advocate a philosophy of 'destruction' thus becomes immaterial. The college, acting here as the instrumentality of the state, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *Id.* at 187–88, 92 S.Ct. at 2349–50.

The language of the *Healy* opinion is instructive in resolving the constitutional issue at bar, since the language is applicable to all student organizations whether socially motivated or politically motivated or both when associational rights have been abridged. *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). In *Healy*, Mr. Justice Powell stated that "[a]mong the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs," 408 U.S. at 181, 92 S.Ct. at 2346, and that "[w]hile the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly and petition." *Id.*

Mr. Justice Powell added that "[t]here can be no doubt that denial of official recognition, *without justification*, to college organizations burdens or abridges that associational right." *Id.* (emphasis added). In *Healy*, the students were denied not only the use of campus facilities for meetings and other appropriate purposes but also the use of customary campus media for communicating with the administration, faculty members, and other students. The respondents in *Healy* argued that the students' ability to meet off campus demonstrated a lack of interference with the students' fundamental rights but the Supreme Court rejected the argument by not limiting the Constitution's protection to direct interference and by stating that "the group's possible ability to exist outside the campus community does not ameliorate significantly the disabilities imposed by the President's action." *Id.* at 183, 92 S.Ct. at 2347.

The Court, aware that the students had filed the application for recognition in conformance with the college's procedural requirements, stated that "the burden was upon the college administration to justify its decision of rejection." *Id.* at 184, 92 S.Ct. at 2347. "[T]he effect of the college's denial of recognition was a form of prior restraint ... [and that] [w]hile a college has a legitimate interest in preventing disruption on the campus, which under the circumstances requiring the safeguarding of that interest may justify such restraint, a 'heavy burden' rests upon the college to demonstrate the appropriateness of that action." *Id.*

While the *Healy* Court allowed recognition of the student organization, it more importantly addressed the issue of justifiable nonrecognition. "Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Id.* at 189, 92 S.Ct. at 2350. There is a line between associational activities resulting in permissible conduct entitled to constitutional protection and associational activities resulting in impermissible conduct requiring administrative regula-

tion. This is "the line between mere advocacy and advocacy directed to inciting or producing imminent lawless action and ... likely to incite or produce such action.'" *Id.* at 188, 92 S.Ct. at 2350 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969), unanimous *per curiam* opinion).

In light of the *Healy* opinion, this Court must examine the present record to determine if this is indeed an example of the denial of official recognition without justification or if this is an example of allowable nonrecognition.

According to the testimony of the GAA president, Mr. Mehring, at the temporary injunction hearing, the GAA was organized to advocate the elimination of legal discrimination against homosexuals, to insure the integrity of the individual, regardless of sexual orientation, against personal and social prejudice, and to affirm a positive self image of the homosexual. This testimony recites the aims and purposes of the GAA as found in the organization's by-laws which were submitted to the student Attorney General. The testimony and accompanying by-laws reflect that form of permissible conduct entitled to constitutional protection—mere advocacy.

■ The Supreme Court in *Healy* reaffirmed the idea "that state colleges and universities are not enclaves immune from the sweep of the First Amendment," 408 U.S. at 180, 98 S.Ct. at 2345, and as the Court in *Healy* held that the local chapter of the SDS was entitled to recognition as a student organization, this Court holds that the GAA is entitled to recognition as a student organization of the University of Oklahoma. As the record is lacking in evidence showing disruptive or illegal activities, mere undifferentiated fear or apprehension on the part of the University Regents or disagreement with philosophy no matter how repugnant to these officials is not enough to overcome First Amendment freedoms. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731

(1969). It is well established that "above all else, the First Amendment means that government [or its authorized instrumentalities] has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

In *Gay Alliance of Students v. Matthews*, 544 F.2d 162 (4th Cir. 1976), the students sought to obtain registration as a student organization and the attendant privileges of registration. The Virginia Commonwealth University Board of Visitors denied the registration and argued that the members of the Gay Alliance of Students (GAS) had suffered no infringement of their associational rights because all that had been withheld had been the University's official seal of approval. The Fourth Circuit rejected this argument relying on *Healy* and *Bates v. City of Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), in which the Supreme Court stated that "[f]reedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." 361 U.S. at 523, 80 S.Ct. at 416. The Fourth Circuit concluded that "so long as VCU maintains a program of registration of student organizations, its refusal to register GAS on the same terms and conditions as those applied to other student organizations violated the first and fourteenth amendments." *Id.* at 167.

The First Circuit was presented with a variation of the issue of student organization recognition and associational rights in *Gay Students Organization v. Bonner*, 509 F.2d 652 (1st Cir. 1974). The Court acknowledged that recognition *per se* is meaningless if accompanied by unreasonable regulation.

█ First Amendment rights of speech and association may be restricted only if the State or the University as an instrument of the State "demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms," *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d

659 (1976), and as the *Bonner* court stated, "the curtailing of expression which [the university officials] find abhorrent or offensive cannot provide the important governmental interest upon which impairment of First Amendment freedoms must be predicated." 509 F.2d at 662. No abridgment of associational rights can be tolerated if the only competing interest is the University's opposition to the content of that expression. Therefore, the Universities must be careful to distinguish between those organizations having lawful, but unpopular, goals and those organizations having both lawful and unlawful goals. The State through the University may regulate the unlawful aspects of such groups under the authority of *Healy* but may not circumscribe the lawful aspects without a showing of the sufficiently important interest recognized by *Buckley*. See *State ex rel. Department of Transportation v. Pile*, 603 P.2d 337, 340 (Okla.1979).

The Regents based their refusal for recognition on the assertion that such refusal was justified by a duty to insure that the purposes of recognized organizations reflect public policy as it is established by prevailing university community standards. The Supreme Court stated in *Papish v. Board of Curators*, 410 U.S. 667, 670, 93 S.Ct. 1197, 1199, 35 L.Ed.2d 618 (1973), that "*Healy* makes it clear that the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.' "

The Regents also based their refusal for recognition on the assertion that the behaviour endorsed by and sought to be promoted by the GAA violates Oklahoma law. While this Court recognizes that carefully drafted organizational by-laws will continue to defeat any argument that there exists express encouragement or endorsement of illegal behaviour or that there exists a call for imminent and lawless action, absent evidence to the contrary the mere "speculation that individuals might at some time engage in illegal activity is insufficient to justify regulation by the state." *Bonner*, 509 F.2d

at 662. To deny recognition, which in itself is a form of regulation, there must be present justification in evidence of behaviour unlawful under state law or otherwise disruptive of campus life. None of the GAA's purposes or activities evidenced present violations of state law and "it is no longer a valid argument to suggest that an organization cannot be formed to peaceably advocate repeal of certain criminal laws." *Gay Lib v. University of Missouri*, 558 F.2d 848 at 856 n. 16 (8th Cir.). As Mr. Justice Douglas stated in his concurring opinion in *Healy*, "[t]he First Amendment does not authorize violence . . . [but] it does authorize advocacy, group activities, and espousal of change." 408 U.S. at 197, 98 S.Ct. at 2354.

The Regents also based their denial of recognition on the assertion that such denial was authorized by their discretionary duty to act for the benefit of the health, welfare, morals and education of the university students. *Pyeatte v. Board of Regents*, 102 F.Supp. 407, 413, (W.D.Okla.), aff'd 342 U.S. 936, 72 S.Ct. 567, 96 L.Ed. 696 (1952); *Rheam v. Bd. of Regents*, 161 Okla. 268, 18 P.2d 535 (1933). While this Court agrees with First Circuit in recognizing that "the campus group sought to be regulated stands for sexual values in direct conflict with the deeply imbued moral standards of much of the community whose taxes support the university," 509 F.2d at 658, and with the Eighth Circuit in recognizing "that a university has residual power 'to assure that the traditional academic atmosphere is safeguarded,' and to promulgate reasonable rules and regulations," 558 F.2d at 856–57 (quoting *Healy v. James*, 408 U.S. 169, 194 n.24, 92 S.Ct. 2338, 2352 n.24, 33 L.Ed.2d 266 (1972)), this Court holds that the exercise of such duty or such power cannot be influenced by personal tastes or be in violation of constitutional rights. "[V]igilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). The *Healy* opinion long ago rejected the idea that First Amendment protections apply with less

force on university campuses than in the community at large. 408 U.S. at 180, 98 S.Ct. at 2345–46.

The Regents also based their denial of recognition on the assertion that to officially recognize the GAA would be to endorse the philosophy advocated by the GAA. This argument, advanced and rejected in *Matthews*, is without merit. The University of Oklahoma has recognized a variety of political, social, and cultural organizations of diverse philosophies. Such recognition does not suggest approval or endorsement by the university of such organizations.

The Regents finally based their denial of recognition on the assertion that the members of the GAA suffered no infringement of constitutional rights as the result of non-recognition. As the Fourth Circuit stated:

> Absent registration, there are admittedly no direct barriers to the members of GAS continuing to meet, to discuss the problems which homosexuals face, and to take lawful action to ameliorate some of these problems. But VCU concedes that a lack of recognition will hinder its recruitment efforts as well as to deny it VCU's services which are afforded to other registered student organizations. These denials are within the scope of *Healy*, and therefore we conclude that there has been a denial of first amendment rights unless there is justification for the refusal of registration.

544 F.2d at 165.

It is the opinion of this Court that in the absence of such justification, the Regents failed to meet their heavy burden of proof and the GAA is entitled to recognition as a university organization. Where the denial of recognition is based on mere suspicion, unpopularity and fear of what might occur and is achieved by state action which burdens associational rights resulting in the lessening of an organization's ability to effectuate legal purposes, guaranteed freedoms have been violated. The degree of effectiveness of an organization in accomplishing its goals depends on its members' ability to communicate with potential mem-

bers, to finance themselves, and to make their presence known among the university community. Interference with this ability, even where subtle and indirect, is offensive to constitutional principles.

■ However, recognition by the University does not preclude regulation by the University. Reasonable regulations as to time, place and manner of activity which are not unduly burdensome may be imposed equally upon all campus organizations. *Healy,* 408 U.S. at 192, 98 S.Ct. at 2351–52; *State ex rel. Dept. of Transportation v. Pile,* 603 P.2d 337, 341 (Okla.1979).

The plaintiffs seek not only recognition by the Regents as the governing body of the University, but also damages from the members of the Board of Regents as individuals for the violation of constitutional and civil rights. Actual damages [2] in the amount of $10,000 and punitive damages in the amount of $100,000 are sought under the authority of 42 U.S.C. § 1983 which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The Supreme Court in *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978), has stated that "the basic purpose of a [Section] 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." Therefore, since this Court has recognized the existence of a constitutional deprivation achieved by persons acting under the color of both state constitutional and statutory authority, it is now necessary to determine whether the requested damages should be granted for such a deprivation.

■ It is important to note at this point that for the purpose of the injunction, the Board of Regents, as a body corporate, can be enjoined. *Gay Student Services v. Texas A & M University,* 612 F.2d 160 (5th Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). The Fifth Circuit, citing *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), stated that "prospective injunctive relief is clearly allowed against state officials in their official capacities." 612 F.2d at 165. For the purpose of monetary damages, as an administrative agency, in essence an arm of the State, the Board enjoys the privilege of Eleventh Amendment sovereign immunity granted to the State. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978). The Supreme Court "has stated that neither the statutory language nor legislative history of Section 1983 evinces a sufficient, express Congressional intention to override the traditional immunities to the States to allow private damage actions against States and their officials pursuant to that statute." *Familias Unidas v. Briscoe,* 619 F.2d 391, 405 (5th Cir. 1980) (*citing Quern v. Jordan,* 440 U.S. 332, 339, 99 S.Ct. 1139, 1144, 59 L.Ed.2d 358 (1979)). However, since the defendant Regents were named as individuals it is only necessary to determine whether they are susceptible to damages awards in that capacity.

The plaintiffs cite as authority for awarding damages the First Circuit case of *Magnett v. Pelletier,* 488 F.2d 33 (1973), a civil rights action against police officers for damages for an alleged unreasonable search and assault. It is the opinion of this Court, however, that this *per curiam* decision is not the final authority as to the damages issue and that the reasoning and authority of *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct.

---

**2.** The plaintiffs seek damages due to the inability to use University facilities without cost, the inability to have free access to the on-campus mail system, the inability to maintain a free bursar's account with the University's Bursar Office, and the inability to apply for free office space at Ellison Hall. They also allege the inability to receive free publicity for speakers and that the denial of recognition caused GAA members to suffer extreme mental anguish.

992, 43 L.Ed.2d 214 (1975), are more instructive.

In *Wood*, the Supreme Court considered the doctrine of qualified immunity for public education officials as the result of a Section 1983 suit brought by respondent high school students against the petitioner school officials alleging that the students' expulsion from school violated their rights to due process. Mr. Justice White, writing for the Court, recognized that common-law tradition and strong public policy reasons required that a qualified immunity be extended to school board members from whom damages were sought under Section 1983. Although the *Wood* petitioners were local school board members involved in a procedural due process context, the rationale for extending the qualified immunity to such petitioners and the guidelines for applying such immunity are relevant to the present case. As the Supreme Court stated in *Scheurer v. Rhodes*, 416 U.S. 232, 241–42, 94 S.Ct. 1683, 1688–89, 40 L.Ed.2d 90 (1974):

> Public officials ... who fail to make decisions when needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all.

The Supreme Court in *Wood* further stated that "[t]he imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter the most conscientious school decisionmaker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school and the students." 420 U.S. at 319–20, 95 S.Ct. at 999–1000. The Court in addressing the circumstances in which the immunity could be invoked noted that the

> standard neither imposes an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system. Any lesser standard would deny much of the promise of [Section] 1983.

*Id.* at 322, 95 S.Ct. at 1001.

The rule enunciated by the Court provides that

> a school board member is not immune from liability for damages under [section] 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

*Id.* The Court added that "[a] compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." *Id.*

To apply the *Wood* standard with both its objective and subjective elements to the case at bar is to determine that a compensatory award would not be appropriate. Under the first part of the *Wood* standard, the qualified immunity would be unavailing to the Regents if they knew or reasonably should have known that their denial of recognition would violate the constitutional rights of the members of the GAA. That is to say, "[t]here is no objective basis for the defense if it is not reasonable to believe that there was a lawful right to take the action in question." *Flores v. Pierce*, 617 F.2d 1386, 1391 (9th Cir. 1980).

While the defendants are neither "charged with predicting the future course of constitutional law," *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), nor given the "duty to anticipate unforeseeable constitutional developments," *O'Connor v. Donaldson*, 422 U.S. 563, 577, 95

S.Ct. 2486, 2495, 45 L.Ed.2d 396 (1975), the defendants are charged with the knowledge of basic unquestioned constitutional rights which manifest in settled, indisputable law. The Regents did not act with such disregard for the established law as to deny them qualified immunity. There had been no relevant pronouncements by this Court or by the Tenth Circuit interpreting Oklahoma law. Indeed, the only case of authority was *Healy v. James* in which a student organization unlike the GAA in philosophy was seeking recognition. To say that the law was indisputable and that the issue was beyond questioning [3] as presented in this context goes too far. The appellate decision in *Gay Lib v. University of Missouri* itself was not handed down until after the Regents had denied recognition to the GAA. While there is a clear unquestionable right of association, this right is not absolute, *Gay Lib*, 558 F.2d at 854–55, and such justifications for denying recognition as advanced by the Regents cannot be characterized as being in bad faith.

The second part of the *Wood* standard requires the presence of a malicious intention to defeat the defense of qualified immunity. "As the subjective aspect of the defense, an official forfeits immunity if, whatever the objective state of the law at the time of his action, his own intent was to harm the plaintiff for a reason prohibited by the Constitution." *Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980). There is no evidence indicating that the Regents acted with malice to deprive the GAA members of constitutional rights or to cause "other injury." The Regents, motivated by what they, after weighing the information made available to them, believed to be in the best interests of the university community, are also not denied the defense of qualified immunity under the second part of the *Wood* standard. This immunity bars the defendants' personal liability not only as to the actual damages sought by the plaintiffs but also as to the punitive damages sought by the plaintiffs.

The plaintiff GAA also has sought an attorney's fee award in the amount of $2,500 under the authority of 42 U.S.C. § 1988. Section 1988 provides in part that "[i]n any action or proceeding to enforce a provision of [Section 1983] . . . the Court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." Courts, under this authority, have held that "unless special circumstances exist to render such an award unjust," *Iranian Students Ass'n v. Edwards*, 604 F.2d 352, 353 (5th Cir. 1979), the prevailing plaintiff is ordinarily entitled to such fees. The difficulty occurs when the plaintiff, as the GAA, has been less than completely successful. While the GAA prevails on the constitutional deprivation issue, it fails to defeat the barrier of qualified immunity on the damages issue. However, as the Fifth Circuit recognized "[t]he proper focus is whether the plaintiff has been successful on the central issue." *Id.* at 353. Therefore, since the GAA was successful on the central issue—the constitutional issue—the GAA is entitled to recover reasonable attorneys fees. However, the same qualified immunity granted by the *Wood* alternatives insulates the Regents not only from personal liability for damages but also forecloses their personal liability for the plaintiffs' attorney's fees. *Familias Unidas v. Briscoe*, 619 F.2d 391, 406 (5th Cir. 1980).

A finding of a constitutional violation is a prerequisite for any relief. Once a violation is proved, liability for damages depends upon whether the rule enunciated in *Wood* and applied in this case offers the shield of qualified immunity—a question resolved in light of all the circumstances as they reasonably appeared at the time of the action on which the liability is sought to be based.

Therefore, pursuant to the foregoing authority which requires that First Amendment rights be examined and applied "in light of the special characteristics of the school environment," *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21

---

**3.** This same issue was being questioned by students at Texas A & M University at this same time. *See Gay Student Services v. Texas A & M University*, 612 F.2d 160 (5th Cir. 1980).

L.Ed.2d 731 (1969), and which recognizes that the authority of school officials to prescribe and control conduct in the schools, *id.*, is not without limit, this Court holds that the existence of the constitutional violation mandates the issuance of the requested equitable injunctive relief and that the rule as outlined by the *Wood* decision requires that qualified immunity be granted to the individual defendants to bar personal liability. This Court reverses the holding of the District Court as it pertains to the issue of the injunction and affirms the holding of the District Court as it pertains to the issue of damages.

REVERSED IN PART; AFFIRMED IN PART.

IRWIN, C. J., and LAVENDER, SIMMS and DOOLIN, JJ., concur.

BARNES, V. C. J., and HODGES, J., dissent.

OPALA, J., disqualified.

BARNES, Vice Chief Justice, dissenting.

I am not convinced that the United States Supreme Court would find the action of the University of Oklahoma in refusing to recognize The Gay Activists Alliance violative of the United States Constitution. In his dissenting opinion to the denial of certiorari in *Ratchford, etc., et al., petitioners, v. Gay Lib et al.*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789, *reh. den.* 435 U.S. 981, 98 S.Ct. 1632, 56 L.Ed.2d 74, Justice Rehnquist, with whom Mr. Justice Black joined, dissenting said:

"... the issue posed in this case is the extent to which a self-governing democracy, having made certain acts criminal, may prevent or discourage individuals from engaging in speech or conduct which encourages others to violate those laws....

"But lurking behind this procedural question (whether or not to grant certiorari) is one which goes to the heart of the inevitable clash between the authority of a State to prevent the subversion of the lawful rules of conduct which it has enacted pursuant to its police power and the right of individuals under the First and Fourteenth Amendments who disagree with various of those rules to urge that they be changed through democratic processes. The University in this case did not ban the discussion in the classroom, or out of it, of the wisdom of repealing sodomy statutes. The State did not proscribe membership in organizations devoted to advancing 'gay liberation.' The University merely refused to recognize an organization whose activities were found to be likely to incite a violation of a valid state criminal statute. While respondents disavow any intent to advocate present violations of state law, the organization intends to engage in far more than political discussion. Among respondent Gay Lib's asserted purposes are the following:

"'3. Gay Lib wants to provide information to the vast majority of those who really don't know what homosexuality or bi-sexual behavior really is. Too much of the same prejudice is now directed at gay people just as it is directed at ethnic minorities.

"'4. Gay Lib does not seek to proselytize, convert, or recruit. On the other hand, people who have already established a pattern of homosexuality when they enter college must adjust to this fact.

"'5. Gay Lib hopes to help the gay community to rid itself of its subconscious burden of guilt. Society imprints this self-image on homosexuals and makes adjustment with the straight world more difficult.'"

As pointed out by Appellees, the aim and intent of The Gay Activists Alliance in this case are practically identical to the above stated purposes of the Gay Lib in the *Ratchford* case.

Justice Rehnquist in the *Ratchford* case further states that:

"... Here the question is not whether Gay Lib as an organization will abide by university regulations. Nor is it really whether Gay Lib will persuasively advo-

cate violations of the sodomy statute. Instead, the question is whether a university can deny recognition to an organization the activities of which expert psychologists testify will in and of themselves lead directly to violations of a concededly valid state criminal law.

"As our cases establish from *Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), in which Mr. Justice Holmes, speaking for a unanimous Court, held that the Government has a right to criminally punish words which are 'used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent,' to *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430, 48 Ohio Ops.2d 320 (1969), some speech that has a propensity to induce action prohibited by criminal laws may itself be prohibited. A fortiori, speech and conduct combined which have that effect may surely be placed off limits of a university campus without doing violence to the First or Fourteenth Amendments."

I therefore respectfully dissent.